IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACQUELINE ALLEN-FILLMORE, | |
| Plaintiff, | |
| v. | No. 22-cv-1610-MRP |
| UNITED STATES OF AMERICA, | |
| Defendant, | |
| and | |
| CITY OF PHILADELPHIA, | |
| Defendant. | |

**The United States' Brief in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction and, in the Alternative, for Summary Judgment**

TABLE OF CONTENTS

I.   Introduction ................................................................................................... 1

II.  Undisputed Facts for Purposes of Rule 56 .................................................. 3

     A. TSA Screening at the Philadelphia International Airport ...................... 3

          1.   Screening ................................................................................... 3

          2.   Control and Maintenance of the Screening Areas ..................... 4

     B. Allen-Fillmore's Fall ............................................................................ 5

     C. Falls at TSA Security Checkpoints at PHL ........................................... 6

III. Procedural History ....................................................................................... 7

IV.  Legal Standards ........................................................................................... 7

     A. Legal Standard for Dismissal Under Rule 12(h)(3) .............................. 7

     B. Legal Standard for Summary Judgment under Rule 56 ........................ 8

V.   The FTCA's Discretionary Function Exemption Precludes Allen-Fillmore's Claims. 9

     A. The FTCA's discretionary function exception divests the Court of jurisdiction.... 9

          1.   The FTCA is a limited waiver of the United States' sovereign immunity. ... 9

          2.   The discretionary function exception limits  the FTCA's waiver of sovereign immunity. ................................................................... 9

     B. The discretionary function exception precludes a negligence theory based on TSA's decision to implement a shoe removal policy for security screening. ........11

     C. The discretionary function exception precludes a negligence theory based on TSA's alleged failure to install a different floor at PHL. ..................................... 13

     D. The discretionary function exception precludes a negligence theory based on TSA's decision not to cover the entire screening area with mats ........................ 14

VI.  There is no genuine issue of material fact supporting a premises liability claim against the United States. ...................................................................................17

     A. TSA is not the possessor of the screening area under Pennsylvania law............. 18

B.  There is no evidence of a condition presenting an unreasonable risk of harm to invitees. ................................................................................................................ 19

C.  Flooring conditions in the screening area were known and obvious. ................. 21

D.  The FTCA otherwise precludes any claim based on the floor allegedly being dirty. 23

VII. The Court should dismiss the City's crossclaim or grant summary judgment for the United States. ................................................................................................................ 25

VIII. Conclusion ................................................................................................................ 25

I.      **Introduction**

In January 2021, the Transportation Security Administration screened 329,877 passengers at the Philadelphia International Airport (PHL or "Airport"). Plaintiff Jacqueline Allen-Fillmore was the only reported slip and fall incident that month; she slipped as she was making her way in her socks through a TSA security checkpoint. The crux of her claim against the United States is that, in light of the Airport's flooring surface, it was unreasonably dangerous to require passengers to remove their shoes and walk on the floor in their socks. Or alternatively, her expert contends that either the City or TSA should have installed a floor that was less slippery. Another option her expert suggests is that non-slip mats could have been placed to cover the entire area where visitors would walk in their socks. And finally, the expert opines, based on an inspection two years after the fall, that the floor may have been dirty at the time of the fall. But there is no evidence of the floor being dirty on January 15, 2021, when Allen-Fillmore fell, and the video evidence, contemporaneous reports, and Allen-Fillmore herself all contradict her expert's suggestion.

None of these theories is actionable against the United States under the Federal Tort Claims Act (FTCA) and the Court should dismiss the complaint or grant summary judgment in favor of the United States. Allen-Fillmore fundamentally challenges TSA's policy of asking passengers to remove their shoes for security screening. That is a paradigmatic discretionary decision informed by public policy considerations, precluded from judicial second-guessing under the FTCA. Even if the Court looked past that threshold flaw, Allen-Fillmore also may not base a claim on a theory that TSA should have installed a different floor at the airport. TSA does not own or control the floor—the City does. Even if TSA did control the flooring material, whether to replace vast swaths of floor at the Airport with some other surface (or ask that the Airport do so) is another paradigmatic discretionary decision not subject to review under the FTCA.

Similarly, Allen-Fillmore may not base a claim on the contention that TSA should have covered the entire screening area with non-slip mats. The location of mats in the screening area is a discretionary decision not governed by any mandatory policy or regulation. As the attached declaration shows, mats provide important visual cues for passengers undergoing security screening about where to stand during that process—additional mats in the area would interfere with those visual markers. Further, as the unrebutted evidence shows, mats raise their own safety concerns—people trip on mats, they deteriorate over time, their edges curl and present a tripping hazard, and they fray—and, of course, they cost money. Balancing these considerations of effective and efficient screening procedures, safety, and cost is a discretionary policy choice.

Even if the Court were to consider the merits, there is an absence of any genuine issue of material fact regarding the basic elements of liability. TSA is not the possessor of the area of the Airport where Allen-Fillmore fell. Rather, it is undisputed that the City owns the Airport, including its floors, and, although the City makes space available to TSA so it can conduct its screenings, TSA does not own or lease those areas. Even if TSA could be said to control the screening area while it is conducting screenings, it is undisputed that its control does not extend to replacing or modifying the flooring surface. (And the City is undisputedly responsible for the overnight cleaning and regular buffing and waxing of the floor.)

Moreover, there is no evidence of the presence of any dangerous condition not obvious to a visitor. Allen-Fillmore acknowledged that there was no foreign substance present on the floor at the time of her fall. She simply contends that the floor is too slippery. But more than 8 million people successfully navigated the Airport floors in 2021 (a year when travel was depressed due to the pandemic). The Airport has common

terrazzo[1] floors that any visitor to the airport is familiar with, including Allen-Fillmore, by her own admission. TSA has long announced to the flying public that it will require passengers to remove their shoes to pass through security. Allen-Fillmore herself had been required to take off her shoes on her prior visits to the Airport and expected to do so on this trip, describing it as "routine." As a matter of law, the Airport's terrazzo floor is not an unreasonably dangerous condition, even for people with socks, and even if it were, its condition is open and obvious. Furthermore, to the extent Allen-Fillmore seeks to base liability on some perceived shortcoming of TSA's cleaning contractor, Byrd Enterprises, the United States is not liable for the conduct of its independent contractors under the FTCA.

Finally, for the same reasons, the Court should dismiss the City's derivative crossclaim against the United States, or grant summary judgment in favor of the United States.

## II.     Undisputed Facts for Purposes of Rule 56

### A.     TSA Screening at the Philadelphia International Airport

#### 1.     Screening

TSA is responsible for protecting the safety of the nation's transportation systems and ensuring freedom of movement for people and commerce. It screens daily roughly two million air passengers that fly commercially in this country. *See* "TSA checkpoint travel numbers (current year versus prior year(s)/same weekday)," Passenger Volumes, https://www.tsa.gov/travel/passenger-volumes.

In connection with its screening, TSA has implemented a policy of requiring most passengers to remove their shoes. Ex. 1 (USA Resp. to Second Supp. Interrogatory). TSA requires that "passengers remove their shoes so they can be screened through an X-ray

---

[1] "Terrazzo" is a mosaic flooring consisting of small pieces of marble or granite set in mortar and given a high polish. *See* https://www.merriam-webster.com/dictionary/terrazzo.

machine." *Id*.; Ex. 1 (Press Release). The TSA shoe removal policy was prompted by a terrorist's attempt to detonate an explosive device in his shoes. TSA requires shoe removal "to allow TSA's technology to identify whether there is an explosive device concealed inside" a passenger's shoes. *Id*.

### 2.    Control and Maintenance of the Screening Areas

The City of Philadelphia owns and runs the Airport. *E.g.*, https://phl.org/about/about-us/management-team; Ex. 2 (Myers Decl. ¶ 2); Ex. 3 (Stressman Dep. at 5:25–6:5); Ex. 4 (City Resp. Interrog. No. 10). TSA does not own or lease the areas in the Airport where it conducts security screenings. Ex. 2 (Myers Decl. ¶ 2); Ex. 3 (Stressman Dep. at 5:25–6:5); Ex. 5 (Myers Dep. at 47:18–24); Ex. 6 (Amended Responses to Interrog.). Instead, the City permits TSA access to portions of the Airport to conduct screening, consistent with federal law. Ex. 2 (Myers Decl. ¶ 2). TSA likewise does not control the flooring at PHL, has no influence on its composition, and has no power to replace it. Ex. 2 (Myers Decl. ¶ 3); Ex. 4 (Myers Dep. at 38:8–11; 133:3–22).

The Airport floors are generally terrazzo floors, including at the D/E Security Checkpoint. Ex. 3 (Stressman Dep. at 11:2–4); Ex. 4 (Myers Dep. at 132:9–133:2). The City cleans the floors overnight, when the screening areas are not in use by TSA. Ex. 3 (Stressman Dep. at 15:22–16:4); Ex. 4 (Myers Dep. at 117:9–20). In addition, the City regularly buffs and waxes the floors. Ex. 3 (Stressman Dep. at 18:18–19:2, 77:7–15). It is the City's responsibility to do so, not TSA's. Ex. 4 (Myers Dep. at 135:14–18).

During the covid-19 pandemic, TSA obtained funding under the CARES Act to hire an independent contractor to perform supplemental cleaning. Ex. 2 (Myers Decl. ¶ 8); Ex. 5 (Myers Dep. at 134:3–10); Ex. 6 (Am. Resp. Interrog. No. 10); Ex. 7 (contract); Ex. . This supplemental cleaning included additional dusting and mopping of floors. Ex. 2 (Myers Decl. ¶ 8); Ex. 5 (Myers Dep. at 32:8–10); Ex. 7 (contract).

### B.     Allen-Fillmore's Fall

On January 15, 2021, Allen-Fillmore went to PHL to catch a flight to North Carolina. *See* Compl. ¶¶ 13–14. Pursuant to TSA procedures, at approximately 10:15 a.m., she loaded her belongings into a security tray and then removed her shoes. *See* Ex. 8 (Video #1 at 10:15 a.m.). Walking with her shoes off in her socks, she carried her suitcase in one arm and her loaded security tray in the other arm around several people who were preparing to pass through security and placed her items on the X-Ray conveyor belt. *See* Ex. 8 (Video #1 at 10:15:45 a.m.). She did so without incident, despite walking with her arms loaded on a terrazzo floor in socks, and then proceeded through the AIT scanning machine. *Id.*

After passing through the AIT scanning machine, she was secondarily screened using a wand by TSO Brown. *See* Ex. 9 (Video #2 at 10:17:51 a.m.); Ex. 10 (Brown Dep. at 8:20–25). After the completion of this secondary screening, while putting her belt back on, Allen-Fillmore stepped off the mat where she had been screened and onto the terrazzo floor. *See* Ex. 9 (Video #2 at 10:19:03 a.m.). Her left foot slid as she stepped on the floor and she fell. *Id.* Another passenger safely navigated the same flooring in her socks at the same time. *Id.*

There was no water, dust, or other foreign substance on the floor at the time of her fall. As Allen-Fillmore testified:

Q:     Did you – did you notice anything, like, on the floor that you
        stepped on?

A:     No.

Q:     You didn't notice it being, like, wet on the floor; right?

A:     Right. No. I didn't notice anything on the floor.

Q:     Did you notice it being, like, unusually dusty or anything on the
        floor when you stepped off the mat?

A:     It wasn't dusty, no.

Q:      And you didn't at any point realize, like, later on that your sock was
        wet because you had stepped on a wet spot or anything like that;
        right?

A:      That's correct.

Ex. 11 (Allen-Fillmore Dep. at 36:2–18).

Similarly, the TSO witnesses present at the scene and others reviewing the video of the fall have all uniformly testified that there was no foreign substance present. Ex. 10 (Brown Dep. at 10:19–24) (TSO witness testifying that there was no liquid or spilled substance present); Ex. 12 (TSA Incident Report showing "Checkpoint Condition Normal at USA-0033 and "there [were] no tripping hazards" at USA-0035). The video showing the fall does not show any sign of a foreign substance present. Ex. 9 (Video #2).

## C.      Falls at TSA Security Checkpoints at PHL

Slip-and-fall incidents at TSA security checkpoints at the Airport are exceedingly rare relative to the number of passengers screened. For the eight-year period from January 1, 2016 through December 31, 2022, approximately 72.5 million passengers were screened at TSA checkpoints at PHL, and there were only 55 reported "slip/trip and fall" incidents. Ex. 13 (USA Resp. to Supp. Interrog.) That is less than one in a million. This tally includes incidents of passenger intoxication, a passenger fainting or experiencing a seizure, a passenger tripping on the anti-fatigue mat that TSOs stand on, and passengers tripping over stanchion bases and bin carts.[2] *Id*. On January 15, 2021, the date of Allen-Fillmore's fall, TSA screened 14,466 passengers at the Airport, and there was only one reported injury, Allen-Fillmore's. For all of January 2021, TSA screened 329,877 passengers at PHL, and there was only one reported slip/trip and fall incident, Allen-Fillmore's. TSA screened 145,180 passengers at the D/E checkpoint alone during January 2021, with Allen-Fillmore's incident the only reported slip/trip

---

[2] Stanchions are upright poles that attach retractable belts used to direct passenger queues.

and fall. For all of 2021, TSA screened 8.3 million passengers at PHL, and there were ten reported "slip/trip and fall" incidents. *Id.*

## III.   Procedural History

Allen-Fillmore submitted a SF-95 Claim Form to TSA on April 8, 2021, asserting that the TSA checkpoint area at Terminal D "has unsafe flooring." Ex. 14 (SF-95). Not having received a final response within the statutory period, she filed a complaint in federal court in April 2022. Allen-Fillmore's amended complaint names the City and the United States as defendants, along with unspecified fictional defendants. She has also filed a motion for leave to file an amended complaint, ostensibly to add an additional defendant, Byrd Enterprises. That motion remains pending.

Discovery has closed, although Allen-Fillmore has suggested she may file a motion to compel further discovery from the United States relating to slip-and-fall incidents at all TSA checkpoints across the nation.

## IV.   Legal Standards

### A.   Legal Standard for Dismissal Under Rule 12(h)(3)

A federal court must dismiss any claim over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3). The law presumes that a cause lies outside of federal courts' limited jurisdiction. *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994). "A claim of sovereign immunity advances a jurisdictional bar which a party may raise at any time." *United States v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000); *see Kontrick v. Ryan*, 540 U.S. 443, 455 (2004); *CNA v. United States*, 535 F.3d 132, 145-46 (3d Cir. 2008); *see also Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (lack of subject matter jurisdiction cannot be waived or forfeited, and courts are obliged to address the issue whenever it is raised).

In a factual challenge to the Court's subject matter jurisdiction, such as this one, no presumption of truth attaches to a plaintiff's allegations, and disputed material facts

will not preclude the Court from evaluating the merits of jurisdictional claims. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). The Court can thus look beyond the pleadings to decide factual matters relating to jurisdiction. *Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir. 2000).

### B.      Legal Standard for Summary Judgment under Rule 56

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to withstand summary judgment, the non-moving party — in this case, Allen-Fillmore — must then show a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Although the Court must draw all reasonable inferences and construe the evidentiary record in the light most favorable to Allen-Fillmore as the non-moving party, *Anderson*, 477 U.S. at 255, Allen-Fillmore "may not rest upon mere allegations, general denials or . . . vague statements" to survive summary judgment, *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). A "mere scintilla of evidence" in her favor is not enough to avoid summary judgment. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

8

V.   **The FTCA's Discretionary Function Exemption Precludes Allen-Fillmore's Claims.**

    A.   **The FTCA's discretionary function exception divests the Court of jurisdiction.**

        1.   **The FTCA is a limited waiver of the United States' sovereign immunity.**

Federal courts lack jurisdiction over suits against the United States unless Congress expressly waives the United States' sovereign immunity to suit. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Any such waiver must be expressed unequivocally in statutory text and will not be implied, *Lane v. Pena*, 518 U.S. 187, 192 (1996), and it must be construed strictly in favor of the sovereign. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34 (1992). Moreover, when the government consents to suit, the terms of the waiver of sovereign immunity define the extent of the court's jurisdiction. *United States v. Mottaz*, 476 U.S. 834, 841 (1986); *Doe 1 v. United States*, 37 F.4th 84, 86 (3d Cir. 2022) (reiterating that, for a plaintiff to sue the United States, Congress "must have waived sovereign immunity for the specific remedy he seeks," and courts must construe Congress's waivers of sovereign immunity narrowly).

Subject to various exceptions and limitations, the FTCA waives the United States' sovereign immunity for certain tort claims arising out of the conduct of federal government employees acting within the scope of their employment, under circumstances where a private person would be liable under applicable state tort law. *See* 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 ("United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances.").

        2.   **The discretionary function exception limits the FTCA's waiver of sovereign immunity.**

The FTCA expressly *does not waive* the United States' sovereign immunity for any claim "based upon the exercise or performance or the failure to exercise or perform

a discretionary function or duty . . . whether or not the discretion involved be abused."
28 U.S.C. § 2680(a). This exception prevents "judicial 'second-guessing' of legislative
and administrative decisions grounded in social, economic, and political policy." *United
States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797,
813-14 (1984). Thus, if a claim falls under this "discretionary function" exception to the
FTCA, a federal court does not have subject matter jurisdiction to hear the claim. *See,
e.g.*, *Baer v. United States*, 722 F.3d 168, 172 (3d Cir. 2013).

     As a threshold matter, a Court considering the application of the discretionary
function exception must first determine what conduct is at issue. *See, e.g.*, *Abunabba v.
United States*, 676 F.3d 329, 332 (3d Cir. 2012). Then, under a two-part test, courts
consider first whether the at-issue policy or actions "involve[d] an element of judgment
or choice." *United States v. Gaubert*, 499 U.S. 315, 322–23, 324–25 (1991) (quoting
*Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *accord Baer*, 722 F.3d at 172. If a
federal statute, regulation, or policy specifically prescribes a course of action for an
employee to follow, the exception does not apply because the employee has no rightful
option but to adhere to the directive. *Abunabba*, 676 F.3d at 332; *Berkovitz*, 486 U.S. at
536. But where a specific course of action is not prescribed, a court proceeds to the
second step, which requires determining "whether that judgment is of the kind that the
discretionary function exception was designed to shield," such as conduct "grounded in
policy" or "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325–25. Although the
decision must involve policy considerations, "[d]iscretionary conduct is not confined to
the policy or planning level." *Id.* at 325. Thus, the discretionary function exception
applies even if the discretion is vested in lower-level actors. *See, e.g. Donaldson v.
United States*, 281 F. App'x 75, 77 (3d Cir. 2008). The focus is not on the agent's
subjective intent in exercising the discretion conferred by statute or regulation, but on
the nature of the actions taken and on whether they are susceptible to policy analysis.
*Abunabba*, 676 F.3d at 333.

### B.   The discretionary function exception precludes a negligence theory based on TSA's decision to implement a shoe removal policy for security screening.

The "conduct at issue" in Allen-Fillmore's claim against the United States is TSA's discretionary decision to implement the shoe removal policy. She fundamentally claims that, in light of the environment in which TSA was tasked to work—PHL Airport with its terrazzo floors—it was unreasonable for TSA to require passengers to remove their shoes. All of her theories of negligence are premised on TSA causing individuals to walk in their socks. This is the "conduct at issue" that is the threshold inquiry in the discretionary function analysis. *See Abbunabba*, 676 F.3d at 332; *see also, e.g., Bell v. United States*, 238 F.3d 419, 2000 WL 1720932 (6th Cir. 2000) (rejecting effort to recharacterize claim as one based on failure to maintain dry floor or use rubber mats when allegedly wet condition ultimately had origin in policy of allowing Post Office lobby area to remain open when service windows were closed; that underlying decision was true "conduct at issue"). Applicability of the discretionary function exception "turns on the nature and quality of the harm-producing conduct, not on the plaintiffs' characterization of the conduct." *See Fothergill v. United States*, 566 F.3d 248, 253 (1st Cir. 2009) (underlying decision was true "conduct at issue").

Determining the "conduct at issue" is essential because it "dictates the policy considerations that are implicated" in the remaining two-step discretionary function analysis. *Abbunabba*, 676 F.3d at 343. There could be no serious question that TSA's decision to implement the shoe removal policy involves an "element of judgment or choice." *Gaubert*, 499 U.S. at 322–23. No statute or policy prohibited TSA from implementing the shoe removal policy. And TSA has explained that its decision to implement the policy was prompted by the 2001 shoe bomber episode and a determination that screening shoes through x-ray machines would protect the flying public from explosive devices. Ex. 1 (USA Resp. Second Supp. Interrog. No. 1 and attached press release). That determination "is of the kind that the discretionary

11

function exception was designed to shield," such as conduct "grounded in policy" or "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325–25.

Allen-Fillmore's counsel has cast a skeptical eye towards the merits of the shoe removal policy through questioning at deposition. *See, e.g.,* Ex. 5 (Myers Dep. at 24:21–27:9). But that is precisely the type of second-guessing that the discretionary function exception forbids this Court from engaging in. *See Varig Airlines*, 467 U.S. at 813. Accordingly, because Allen-Fillmore fundamentally challenges TSA's discretionary shoe removal policy, her claims must be dismissed as to the United States.

Relatedly, Allen-Fillmore's core challenge to the content of TSA's screening policies and procedures violates a separate jurisdictional bar. Pursuant to 46 U.S.C. § 46110(a), all challenges to TSA orders must be brought directly, and exclusively, in the courts of appeals. *See* 46 U.S.C. § 46110(a). TSA Standard Operating Procedures (including the shoe removal policy) are final orders within the meaning of Section 46110(a). *E.g., Blitz v. Napolitano*, 700 F.3d 733, 740 (4th Cir. 2012); *Corbett v. United States*, 458 F. App'x 866 (11th Cir. 2012). The courts of appeals have exclusive jurisdiction "not only over direct challenges to final agency orders [under § 46110(a)] but also any claims inescapably intertwined with the review of those orders." *Amerijet Int'l, Inc. v. U.S. Dep't of Homeland Sec.*, 43 F. Supp. 3d 4 (D.D.C. 2014); *see also Fleming v. U.S. Dep't of Transp.*, 348 F. App'x 736 (3d Cir. 2009). Allen-Fillmore's claim that TSA negligently required individuals to remove their shoes and walk on the Airport's terrazzo floor is inescapably intertwined with a challenge to the TSA shoe removal policy. Accordingly, this Court lacks jurisdiction to consider Allen-Fillmore's claim against TSA for that reason as well.

C.   **The discretionary function exception precludes a negligence theory based on TSA's alleged failure to install a different floor at PHL.**

Even if the Court were to look past Allen-Fillmore's core challenge to TSA's shoe removal policy, Allen-Fillmore's alternative framings of her claim still fail for legal and factual reasons. Her expert has also suggested that "defendants" should have installed a different flooring material or applied an anti-slip coating to the floor at PHL. *See* Ex. 15 (Report at pp. 21, 28). To the extent this opinion is even directed at TSA and not the City, it cannot be a basis for liability under the FTCA.

First, TSA has no ability to install a different flooring material or apply an anti-slip coating to the floor. The undisputed record evidence shows that TSA does not own or lease the checkpoint areas at PHL. Ex. 2 (Myers Decl. ¶ 2); Ex. 3 (Stressman Dep. at 5:25–6:5); Ex. 5 (Myers Dep. at 47:18–24); Ex. 6 (Am. Resp. Interrog. No. 10) TSA also does not control the flooring material present at TSA security checkpoints at PHL. Ex. 2 (Myers Decl. ¶ 3). It has no power or authority to make fundamental changes to the flooring, such as tearing out existing flooring and replacing it with different material. *Id.*; Ex. 5 (Myers Dep. at 133:17–21). Nor does TSA have power or authority to make any permanent or semi-permanent alterations to the flooring, such as the application of an anti-slip coating. *Id*. Accordingly, TSA cannot plausibly be liable for allegedly failing to install a different flooring surface in the Airport.

Even entertaining the theory for the sake of argument, any claim based on an alleged failure to install a different floor or apply an anti-slip coating to the Airport's floor would also be precluded by the discretionary function exception. Asking the City to make that kind of significant change to its physical plant could interfere with TSA's productive working relationship with the City. It would be asking the City to undertake significant and expensive modifications to its facility. *See* Ex. 2 (Myers Decl. ¶¶ 4–5). Applying an anti-slip coating would also raise concerns about maintaining a clean surface—anti-slip surfaces are less easily cleaned and can attract dirt. They also

13

sometimes can present tripping hazards in and of themselves, depending on the method used. *Id.*

Modifying the Airport's floors (or more precisely, asking the City to modify the Airport's floors) therefore involves an element of judgment or choice. No statute or regulation specifically prescribes a course of action for TSA's employees to follow with respect to the flooring material at PHL, and TSA is not aware of one. Further, as discussed above, modifying the Airport's floors, through significant expense, raises policy considerations not subject to judicial second-guessing.

> **D.    The discretionary function exception precludes a negligence theory based on TSA's decision not to cover the entire screening area with mats.**

Allen-Fillmore's expert has also suggested TSA was negligent in not covering the entire checkpoint area in non-slip mats. As with the flooring surface complaint, this claimed basis of negligence obfuscates the true "conduct at issue"—TSA's implementation of a shoe removal policy at an Airport with a terrazzo floor. But even considering the theory as stated, any claim based on TSA's purported failure to lay non-slip mats over the entirety of the checkpoint similarly is barred by the FTCA's prohibition on claims implicating discretionary functions.

With respect to the first step in the discretionary function analysis, there is no mandatory regulation or statute that governs the placement and location of additional anti-slip mats in the TSA screening areas. Ex. 2 (Myers Decl. ¶ 6); Ex. 5 (Myers Dep. at 67:5–12). Insofar as TSA's policies relate to mats, they were followed: (1) the layout of the mats present at the checkpoint was consistent with TSA procedures, Ex. 5 (Myers Dep. at 71:18–73:6), (2) the design guide for checkpoint layout does not address mats, *Id.* at 68:1–3, and (3) it was policy to have a rubber mat in the area immediately outside the advanced imaging technology area. *Id.* at 67:8–17. No policy or regulation required the placement of additional mats beyond those that were present. *Id.; cf. Owens v.*

14

*Sherrod*, 2012 WL 5208637, *3 (W.D. La. 2012) ("The BOP building standards do not appear to require slip-resistant mats. . . . Therefore, the decision to not place slip-resistant mats in the shower stalls was discretionary, which satisfies the first prong of the discretionary-function test.").

Whether to carpet the entire checkpoint area in anti-slip mats is also the kind of decision "that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 325–25. First, and fundamental to TSA's core mission, the mats used for secondary screening provide a helpful visual cue for passengers, showing them where to stand while the screening takes place—the addition of more mats would interfere with that clear delineation. Ex. 2 (Myers Decl. ¶ 7). *See Abunabba*, 676 F.3d at 338–39 (discussing caselaw addressing relationship of discretionary consideration to agency's mission). The current arrangement contributes to the orderly running of the security checkpoints.

Second, mats themselves present tripping hazards. They deteriorate over time. Their edges curl and fray. Ex. 2 (Myers Decl. ¶ 7); Ex. 5 (Myers Dep. at 136:25–137:5). Even a pristine mat can present a tripping hazard when someone catches their foot on the edge of the mat, but the risk is higher with an older deteriorated mat. Third, the use of numerous adjoining mats presents special tripping hazards because the edges may raise where the mats meet. Ex. 2 (Myers Decl. ¶ 7); Ex. 5 (Myers Dep. at 66:22–67:3); *cf. Valente v. United States*, 2023 WL 1838012, *11 (E.D.N.Y. 2023) (considering claim arising from trip on adjoining mats). As such, the use of additional mats—when not justified by, for example, the need to absorb rainwater tracked in from outside—can cause more slip and fall incidents than they prevent. Ex. 5 at 66:22-67:3. Notably, the TSA screening areas at PHL are a good distance from the entrances and rarely is water tracked all the way to the screening area. Ex. 2 (Myers Decl. ¶ 7).

In addition, mats are more difficult to clean than the airport's terrazzo floor, and closing lanes for cleaning would delay the TSA screening process. *Id*. And finally,

procuring additional mats to all TSA check points would amount to a significant expense, both upfront and ongoing. Ex. 2 (Myers Decl. ¶ 7); Ex. 5 (Myers Dep. at 67:5–11.).

All of these concerns are valid policy-based considerations that implicate the discretionary function exception. *See, e.g., Mitchell v. United States*, 225 F.3d 361, 366 (3d Cir. 2000) (combination of limited funds, other pressing safety issues, and competing priorities, were policy reasons calling for application of discretionary function exception for decision not to repair a head-wall); *Fothergill*, 566 F.3d at 253 (ruling that "[d]eciding whether to install curbs or barriers in a parking lot, when to do so, how to array them, and the like are variables about which reasonable persons can differ" and are informed by balancing concerns of "efficiency, safety, aesthetics, and cost"); *Pudeler v. United States*, 2013 2013 WL 6511937, *7 (D. Conn. 2013) ("It is not [the] court's role to second guess the layout of TSA security checkpoints, nor is it within the purview of this court to determine the process by which passengers pass through the magnetometer.") (quotations omitted); *Stiff v. Transp. Sec. Admin.*, 2011 WL 13340910, *4–5 (M.D.N.C. 2011) (determining that TSA's operation and set up of the security x-ray machine involve policy considerations given finite resources and personnel balanced against security objectives); *Rao v. United States*, 2010 WL 3607143, *7–8 (D. Mass. 2010) (finding that TSA's budgetary and resource concerns involved in security checkpoint design implicate decisions protected under the exception); *Owens*, 2012 WL 5208637, at *3 ("This apparently economic and policy-driven consideration indicates that the warden's decision, to not install mats in the shower stalls, is the type of decision the discretionary function exception was designed to shield. Therefore, defendants have satisfied the second prong of the discretionary function exemption analysis."); *Cronin v. United States*, 2020 WL 5040597, *4 & n.5 (E.D.N.Y. 2020) (applying discretionary function exemption because, "there was a mat in the [Post Office] vestibule area, which

16

is all that the Handbook requires. The Handbook does not make reference to the exact placement of the mat within the vestibule area.")

TSA's balancing of these policy-based discretionary considerations may not be second-guessed by Allen-Fillmore or this Court under the FTCA. Allen-Fillmore's claims should be dismissed for lack of subject matter jurisdiction.

## VI. There is no genuine issue of material fact supporting a premises liability claim against the United States.

Allen-Fillmore's amended complaint alleges premises liability negligence against the United States under the FTCA, the exclusive cause of action available to plaintiffs who seek tort damages from the United States. *See* 28 U.S.C. §§ 1346(b)(1), 2679(b)(1). The FTCA provides that the United States shall be liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

This Court should apply substantive Pennsylvania negligence law in this case. The Court looks to Pennsylvania law because Allen-Fillmore's injury occurred in Pennsylvania, and under the FTCA, the Court determines liability "in accordance with the law of the place where the act or omission occurred." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004) (citing 28 U.S.C. § 1346(b)(1)).

Under Pennsylvania law, a claim for negligence contains four elements: "(1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another." *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005) (applying Pennsylvania law).

### A.    TSA is not the possessor of the screening area under Pennsylvania law.

Allen-Fillmore advances a claim of premises liability. Under Pennsylvania law, a "possessor of land" owes certain duties to invitees[3] and may be subject to liability for physical harm caused to invitees by a condition on the land involving an unreasonable risk of harm to invitees, if certain other conditions are satisfied. RESTATEMENT (SECOND) OF TORTS § 343 ("Dangerous Conditions Known to or Discoverable by Possessor").

Here, Allen-Fillmore's fall occurred on land undisputedly owned by the City of Philadelphia, not TSA or the federal government. Ex. 2 (Myers Decl. ¶ 2); Ex. 3 (Stressman Dep. at 5:25–6:5); Ex. 4 (City Resp. Interrog. No. 10). Further, TSA holds no lease or other property interest in the screening area. Ex. 5 (Myers Dep. at 47:18–24). Instead, the City simply permits TSA to conduct screening operations at the checkpoints, in compliance with federal law. Ex. 2 (Myers Decl. ¶ 2).

TSA exercises control over the screening process itself, but it does not control the physical premise where those screenings occur.[4] *See Viner v. United States*, 2022 WL 17573143, *4 (E.D. Ky. 2022) (reviewing caselaw and concluding that while the law makes clear "that the TSA controls its agents and their security screenings," the cases do not suggest that "the TSA controls the physical premises in which its agents conduct their security screenings" and the plaintiff in *Viner* "have not provided any facts to show that the TSA was in control of the physical premise where Mrs. Viner fell"). TSA was not responsible for the regular overnight cleaning of the floors. That was performed by the City. Ex. 5 (Myers Dep. at 117:9–20); Ex. 3 Stressman Dep. at 15:22–16:4). Further, it

---

[3] The United States assumes for purposes of this motion that Allen-Fillmore was an "invitee" under Pennsylvania premises liability law.

[4] Allen-Fillmore's premises liability claim differs from other cases based on alleged negligence in the course of the screening process. *See, e.g., Menkin v. United States*, 99 F. Supp. 3d 577 (E.D. Pa. 2015). In *Menkin*, the plaintiff's claim was based on TSA allegedly negligently failing to provide ambulatory assistance after disallowing the plaintiff's use of a cane. *Id.* at 580. The negligence claim in *Menkin* did not depend on TSA's status as a "possessor" of the screening area at the Airport.

was the City, not TSA, that periodically buffed and waxed the terrazzo floors. Ex. 3
(Stressman Dep. at 77:7–15). Nor did TSA have control over the flooring material in
place at the checkpoints. Ex. 2 (Myers Decl. ¶ 3); Ex. 5 (Myers Dep. at 38:8–11; 133:3–
22). TSA has no power to rip out the terrazzo floors, replace it with a grippier surface, or
install carpeting throughout. Ex. 2 (Myers Decl. ¶ 3); Ex. 5 (Myers Dep. at 133:17–22)
While TSA is authorized to conduct screening operations under federal law, it has no
property rights to modify the physical structure of the Airport. Ex. 2 (Myers Decl. ¶ 3);
Ex. 3 (Stressman Dep. at 6:2–5); Ex. 5 (Myers Dep. at 133:17–22).

Accordingly, TSA is not a "possessor" of the screening area and does not control
the area in a manner sufficient to subject it to premises liability based on a theory that
the Airport's physical plant presents an unreasonable risk of harm to invitees.

### B.    There is no evidence of a condition presenting an unreasonable risk of harm to invitees.

Pennsylvania law recognizes that "a possessor of land is not an insurer of the
safety of those on his premises." *Moultrey v. The Great A & P Tea Co.*, 422 A.2d 593,
595-96 (Pa. Super. Ct. 1980). Rather, Pennsylvania has adopted the Restatement
(Second) of Torts, which subjects possessors to liability for injuries to invitees caused by
dangerous conditions, only when the possessor:

>   (a) knows or by the exercise of reasonable care would discover
>   the condition, and should realize that it involves an
>   unreasonable risk of harm to such invitee, and
>
>   (b) should expect that they will not discover or realize the
>   danger, or will fail to protect themselves against it, and
>
>   (c) fails to exercise reasonable care to protect them against the
>   danger.

RESTATEMENT (SECOND) OF TORTS § 343 ("Dangerous Conditions Known to or
Discoverable by Possessor"); *see Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983)
(adopting RESTATEMENT (SECOND) OF TORTS § 343).

"As such, the mere existence of a harmful condition in a public place of business, or the mere happening of an accident due to such a condition is neither, in and of itself, evidence of a breach of the proprietor's duty of care to his invitees, nor raises a presumption of negligence." *Moultrey*, 422 A.2d at 596. Thus, "negligence of a store owner cannot be inferred merely because a customer has an accident." *Myers v. The Penn Traffic Co.*, 606 A.2d 926, 932 (Pa. Super. Ct. 1992); *see also Varghese v. Kellermeyer Bergensons Servs., LLC*, 2019 WL 1114903 (E.D. Pa. 2019) ("[T]he law is clear that 'the mere happening of an accident does not establish negligence nor raise an inference or presumption of negligence.") (*quoting Laubach v. Haigh*, 433 Pa. 487, 489 (1969)).

Here, the undisputed evidence is that there was no foreign substance that caused Allen-Fillmore to slip. Ex. 11 (Allen-Fillmore Dep. at 36:2–18); Ex. 10 (Brown Dep. at 10:19–24); Ex. 12 (TSA Incident Report showing "Checkpoint Condition Normal" at USA-0033 and "there [were] no tripping hazards" at USA-0035; Ex. 9 (Video #2); *see Varghese*, 2019 WL 1114903, *5 (holding no reasonable factfinder could find a dangerous condition when plaintiff conceded there was no foreign substance that caused her fall and simply claimed the floor was "slippery"); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version . . . for purposes of ruling on a motion for summary judgment."). Instead, her expert principally claims that the Airport's terrazzo floor was just too slippery for someone to safely walk on in socks.[5] As an initial matter, this opinion is contrary to extensive caselaw finding that terrazzo floors do not themselves present an unreasonable risk of harm. *See Hess v. United States*, 666 F. Supp. 666, 673 (D. Del. 1987) ("A terrazzo floor

---

[5] To the extent Allen-Fillmore's expert suggests there may have been imperceptible dust on the ground, that could not be a basis of liability because there is no evidence TSA had actual or constructive notice of such a condition. *See, e.g., Harrell v. Pathmark*, 2015 WL 803076, *1–2 (E.D. Pa. 2015).

is not in and of itself an unreasonably dangerous condition."); *Rogers v. Binkham*, 188 A.2d 821 (Pa. Super. Ct. 1963) ("[A] terrazzo entranceway, even though wet from rain, is not of itself such a dangerous condition as to constitute negligence."); *Sheridan v. Horn & Hardart*, 77 A.2d 362, 363 (Pa. 1951); *Copelan v. Stanley Co. of America*, 17 A.2d 659, 661 (Pa. Super. Ct. 1941).

Further, no reasonable factfinder could find an unreasonable risk of harm in light of the undisputed evidence that millions of people safely navigate the Airport's terrazzo floors, without shoes, every year in the course of their security screenings. *See* Ex. 13 (USA Resp. Supp. Interrog. No. 1). Indeed, in the entire month of January 2021, Allen-Fillmore was the only individual who reported a slip-and-fall at a TSA security checkpoint at PHL, of the 329,877 screened passengers. *Id.* During the seven-year period from January 2016 through the end of 2022, approximately 72.5 million passengers proceeded through TSA checkpoints at PHL. *Id.* Only 55 reported incidents were categorized as "slip/trip and fall" incidents, which includes passengers who were intoxicated, experienced a seizure, or tripped on the anti-fatigue mats. That is less than one in one million passengers. A less than one in million chance of an accident is not an "unreasonable risk of harm." Notably, in the video of Allen-Fillmore's fall, numerous people can be seen safely navigating the TSA checkpoint in their socks at the same point in time, under exactly the same floor conditions. Even Allen-Fillmore herself—on the other side of the X-ray machine—can be seen hurrying to the front of the conveyor belt line in her socks, with one arm burdened with a loaded security bin and the other carrying her packed suitcase. Ex. 8 (Video #1).

### C.   Flooring conditions in the screening area were known and obvious.

Even assuming TSA is a "possessor of land" for purposes of Allen-Fillmore's claim, possessors of land have no duty of care to protect invitees from known or obvious conditions. *Carrender*, 469 A.2d at 123. Under the known and obvious doctrine, "the

law of Pennsylvania does not impose liability if it is reasonable for the possessor to believe that the dangerous condition would be obvious to and discovered by his invitee." *Id.* (citation omitted). The doctrine follows from the principle that an invitee has a duty "to look where he [or she] is walking and see that which is obvious." *Villano v. Sec. Savings Assoc.*, 407 A.2d 440 (Pa. Super. Ct. 1979).

A condition is obvious when the condition and the risk are apparent to and would be recognized by a reasonable person who, in the position of the visitor, exercises "normal perception, intelligence, and judgment." *Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 123-24 (Pa. Super. Ct. 2006). The question whether a condition was known or obvious is an objective one, looking from the perspective of a reasonable person. RESTATEMENT (SECOND) TORTS § 343A comment b. The Court may decide whether a condition was open and obvious "where reasonable minds could not differ as to the conclusion." *Carrender*, 469 A.2d at 124.

Here, any alleged "hazard" of walking on a terrazzo floor in socks was necessarily known and obvious, both objectively to a reasonable person and subjectively to Allen-Fillmore. The characteristics of terrazzo floors are common knowledge. *See Hess*, 666 F. Supp. at 669. Millions of people pass through TSA checkpoints at the Airport in their socks; they recognize that one should use caution when walking in socks on terrazzo and do not fall. Ex. 5 (Myers Dep. at 23:16–24:12). And Allen-Fillmore was surely familiar with the Airport's floors, having flown out of PHL on numerous occasions. Ex. 11 (Allen-Fillmore Dep. at 16:4–8). Like any other air travel passenger in 2021, she knew well that she would be required to remove her shoes to pass through security at the Airport. *Id. at* 18:18–19:1. It is common knowledge that socks generally have less traction than shoes. Allen-Fillmore was free to walk with greater caution, wear socks with grippy bottoms, remove her socks entirely, or ask for assistance, if she were concerned. She opted not to. Instead, she unfortunately fell.

There were no unexpected hazards at the TSA security checkpoint. Rather, Allen-Fillmore encountered precisely the situation she expected to encounter—the Airport's terrazzo floor and TSA's requirement to remove shoes for screening. Any hazard therefore was "known and obvious" and may not be the basis of liability.

### D. The FTCA otherwise precludes any claim based on the floor allegedly being dirty.

Although the undisputed evidence is that the floor was not dusty and there was no foreign substance present, to the extent Allen-Fillmore would attempt to base her claim on an alleged failure to maintain a clean floor, the attempt would be barred. The City was undisputedly responsible for cleaning the floors. Ex. 5 (Myers Dep. at 117:9–20); Ex. 3 Stressman Dep. at 15:22–16:4). And, at the time of Allen-Fillmore's fall, TSA had contracted with an independent contractor, Byrd Enterprises, to provide supplemental floor cleaning. Ex. 5 (Myers Dep. at 32:4–10; 134:3–10); Ex. 7 (Byrd Contract, USA-0083–0124). Neither the City nor Byrd are "employees of the government" for whose negligence the United States has waived sovereign immunity. *See* 28 U.S.C. § 2671. Specifically with respect to Byrd, to the extent Allen-Fillmore contends that Byrd should have cleaned more effectively, the contention is barred by the independent contractor exception to the FTCA.

The Federal Tort Claims Act's prohibition on subjecting the federal government to liability based on the conduct of independent contractors is well-established. The FTCA covers injuries caused by "any employee of the Government," and defines "employee" to include employees of "any federal agency but excludes 'any contractor with the United States.'" *United States v. Orleans*, 425 U.S. 801, 813–14 (1976) (quoting 28 U.S.C. § 1346(b), 2671). "A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Id.* (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)); *see also Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1997).

It is not uncommon for contractors to work "pursuant to a highly detailed and exacting contract between" the contractor and a federal agency, but that "does not signify that the government is controlling the 'manner and means' by which the job is accomplished." *Wilson v. MVM, Inc.*, 2004 WL 765103 (E.D. Pa. 2004) (vacated in part on other grounds). Rather, "the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs or of state governmental bodies into federal governmental acts." *Orleans*, 425 U.S. at 816. "[T]he question here is not whether the [contractor] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *Id.* at 815; *see also Williams v. United States*, 50 F.3d 299, 306 (4th Cir. 1995) ("*Logue* and *Orleans* establish the principle that the United States will not be liable under the independent contractor exception to the FTCA by virtue of entering contracts and demanding compliance with federal standards, unless the United States actually supervises the 'day-to-day operations' of the endeavor."); *Dalessio v. U.S. Dep't of Housing & Urban Dev.*, 528 F. Supp. 3d 341 (E.D. Pa. 2021) (granting summary judgment for United States because agency did not control day-to-day activities of contractor).

Here, Byrd agreed to a detailed cleaning contract. *See* Ex. 7. Under the contract, Byrd acted "independently and not as an agent of the Government." *Id.* at USA-0086. Byrd was contractually required to "provide all management, administrative, clerical, and supervisory functions required for the effective and efficient performance of this contract." *Id.* at UA-0096. There is no evidence that TSA controlled Byrd's day-to-day maintenance and cleaning operations. Ex. 2 (Myers Decl. ¶¶ 8–9). Accordingly, the FTCA's independent contractor bar applies to any claim premised on purported negligence of Byrd Enterprises. *See Orleans*, 425 U.S. at 814; *Smiley v. Artisan Builders*, 2015 WL 3948044, *6 (E.D. Pa. 2015) (limited supervision is not sufficient to

24

establish that a party is a government employee rather than an independent contractor). Therefore, to the extent Allen-Fillmore would base any claim of negligence on inadequate cleaning, that claim must fail as to the United States.

## VII.   The Court should dismiss the City's crossclaim or grant summary judgment for the United States.

For the same reasons, this Court should dismiss the City's crossclaim against the United States or, in the alternative, grant summary judgment for the United States. The City's crossclaim is conclusory and entirely derivative of Allen-Fillmore's claim. *See* Doc. 20 at 20–21. It asserts no independent basis for liability against the United States. The City is no more able to subject the United States to liability for discretionary functions, the actions of independent contractors, or claims of premises liability negligence without factual foundation than is Allen-Fillmore. Accordingly, the same deficiencies with Allen-Fillmore's claim against the United States are equally applicable to the City's crossclaim.

## VIII.  Conclusion

For the reasons discussed above, plaintiff's complaint should be dismissed for lack of subject matter jurisdiction, or, in the alternative, summary judgment should be granted in favor of the United States. And for the same reasons, the Court should dismiss the City's crossclaim against the United States, or grant summary judgment in favor of the United States on the crossclaim.

Respectfully submitted,

Dated: March 17, 2023

JACQUELINE C. ROMERO
United States Attorney


/s Susan R. Becker for GBD
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

25

/s Landon Y. Jones III
LANDON Y. JONES III
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
landon.jones@usdoj.gov
(215) 861-8323 (Direct)
(215) 861-8618 (Fax)