IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACQUELINE ALLEN-FILLMORE | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | |
| | : | NO. 22-1610 |
| UNITED STATES OF AMERCA, | : | |
| CITY OF PHILADELPHIA, et al. | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

**Perez, J.**                                                                              **August 28, 2024**

This matter came before the Court for a bench trial, which was held from October 23-25, 2023. Plaintiff Jacqueline Allen-Fillmore asserted claims for negligence against the United States of America and the City of Philadelphia for personal injuries she sustained when she slipped and fell passing through a security checkpoint at the Philadelphia International Airport. At the close of trial, this Court ordered the Parties to submit proposed findings of fact and conclusions of law. The parties filed their proposals on December 19, 2023. In accordance with Federal Rule of Civil Procedure 52(a) and upon review of the Parties' post-trial submissions, as well as the entire record, the Court now makes its findings of fact and conclusions of law. For the reasons stated below, this Court finds that Plaintiff Allen-Fillmore is entitled to damages because Defendant United States breached a duty of care owed to her. However, this Court finds that Plaintiff has not proven by a preponderance of the evidence that the City of Philadelphia is liable for her injuries.

1

## I.    FINDINGS OF FACT

### A.  The Parties

Plaintiff Jacqueline Allen-Fillmore, a 71-year-old woman, is a retired nurse who lives in Dover, Delaware.[1] Defendant City of Philadelphia ("The City") owns and operates the Philadelphia International Airport ("PHL").[2] Defendant United States of America ("The United States" or "The Government") is responsible for the operations of the Transportation Security Agency ("TSA"), which is an agency of the United States Department of Homeland Security.[3] TSA's protocols generally require airline passengers receiving standard airport screening to remove footwear so it can be screened through an x-ray machine. The shoe removal policy was put in place following a failed terrorist attack in 2001 involving a man who attempted to detonate an explosive device in his shoes.[4]

An agreement between the City and the Government, titled "The Other Transaction Agreement" ("OTA"), establishes terms and conditions governing the TSA's use of space at the federally mandated security checkpoints in PHL.[5] The OTA dictates that the City provide use of its space in an "as-is" condition.[6] The TSA controls when City personnel may enter the security checkpoint to perform custodial duties. Airport custodians only enter TSA security checkpoints during hours of non-operation and are instructed not to touch any TSA equipment.[7]

---

[1] Trial Tr. Oct. 23, 2023 (ECF No. 98) at 175.
[2] Government Exh. 7.
[3] *Id.*; ECF No. 98 at 89, 94.
[4] ECF No. 8 at 6.
[5] Government Exh. 7; ECF No. 98 at 90-91.
[6] ECF No. 98 at 121-122.
[7] *Id.*

### B. Plaintiff Jacqueline Allen-Fillmore's Fall at the TSA Checkpoint

On January 15, 2021, Plaintiff traveled to PHL for a flight to North Carolina.[8] At approximately 10:15 a.m., Plaintiff entered the Terminal D/E security screening checkpoint operated by TSA.[9] At the direction of TSA agents, Plaintiff loaded her belongings into a security tray to be screened and, pursuant to TSA policy, removed her shoes. She was instructed to remove her belt prior to passing through the scanning machine. Plaintiff was wearing socks as she proceeded through the checkpoint.[10]

After passing through the scanning machine, TSA Agent Dominique Brown conducted a pat-down of Plaintiff and then directed her to retrieve her belongings.[11] At this point, Plaintiff was forced to step off the mats and onto the bare terrazzo[12] floor to collect her property from the conveyor belt. Immediately upon leaving the mat, Plaintiff slipped on the terminal floor and fell to the ground. Plaintiff's fall was captured on video surveillance.[13] This Court finds that Plaintiff's fall was a result of how slippery the terrazzo was for people wearing socks and was not caused by any hazardous substance or condition present. The Court also concludes that Plaintiff's actions were sufficiently prudent as she attempted to safely navigate through the checkpoint. While one may anticipate that flooring would be less slip resistant in socks, Plaintiff herself did not do anything to increase her risk of falling. As a result of her fall, Plaintiff suffered a tibial plateau fracture, which required surgery and the placement of permanent hardware in her knee.[14]

---

[8] *Id.* at 178.
[9] *See* Government Exh. 29 (Video No. 1).
[10] ECF No. 98 at 178-179.
[11] Government Exh. 30 (Video No. 2); Trial Tr. Oct. 24, 2023 (ECF No. 99) at 7, 128.
[12] Terrazzo is a cementitious material, similar to concrete, which provides a "flat, level, and smooth" surface for flooring that is very hard and durable. It is the dominant flooring used throughout much of PHL. ECF No. 100 at 89-90.
[13] Government Exh. 30 (Video No. 2).
[14] ECF No. 98 at 181-183; Tr. Transcript of Dr. Manifold at 13.

### C. *Expert Testimony on Flooring at PHL*

At trial, the Court heard testimony from two experts: Scott Moore, P.E.,[15] a licensed civil engineer who was a liability expert for Plaintiff; and Brian Mills, P.E., a licensed mechanical engineer and human factors expert who testified on behalf of the City. Plaintiff's Expert Moore and the City's Expert Mills conducted two separate site inspections of TSA Checkpoint D/E. They each performed testing of the terrazzo flooring using a tribometer to measure slip resistance.[16]

Both Moore and Mills concluded that the terrazzo flooring at PHL is slip resistant under dry conditions for pedestrians who are *wearing appropriate footwear*.[17] In reaching their opinions, both experts relied on the International Building Code ("IBC"), which has been adopted by the City in the Philadelphia Building Construction and Occupancy Code, as well as the industry standards for slip resistance set forth by the American Society for Testing and Materials ("ASTM") and the American National Standards Institute ("ANSI").[18] These flooring safety standards establish slip resistance criteria for a floor's *intended use* and environmental conditions.[19]

This Court finds that the terrazzo flooring at PHL is slip resistant for its intended use—that is, for pedestrians wearing appropriate footwear.[20] Moore's opinion went beyond this conclusion, affirmatively finding that the terrazzo flooring at PHL is *not* slip-resistant for people walking in socks. However, this Court finds issues with his methodology.[21] This Court will not credit Moore's

---

[15] Mr. Moore was specifically qualified as an expert in flooring analysis, walking safety analysis, slip resistance testing, and fall prevention.

[16] A tribometer is a device that simulates human walking and measures the levels of friction between two surfaces—in this case, between footwear and the terrazzo flooring at PHL. Experts Moore and Mills used tribometers made by different manufacturers, but both instruments perform the same function. The tribometer kits include a rubber test "foot" to be used when taking measurements.

[17] Trial Tr. Oct. 25, 2023 (ECF No. 100) at 84-85; 94; 121.

[18] *See* ECF No. 100.

[19] *Id.* at 110, 124.

[20] *Id.* at 110.

[21] Moore performed tribometer testing of the terrazzo with the standard rubber test foot supplied by the manufacturer and another series of testing in which he modified the manufacturer's foot by cutting out a portion of Plaintiff's sock and taping it to the sensor. As was elicited during cross-examination, it is possible to request a modified sensor from the manufacturer that can simulate an alternative type of footwear.

4

testimony relating to his tests of the floor with a cut-out section of Plaintiff's socks because he failed to identify any guidelines, professional code, literature, or other authority to support this methodology. There is no applicable code or standard for flooring surfaces that specifically addresses slip-resistance for pedestrians not wearing footwear.[22] Walking in socks does not constitute an intended use of the terrazzo flooring at PHL.

Despite the deficiencies in Moore's methodology, i.e., attempting to empirically prove the lack of slip resistance, the totality of evidence does lead the Court to find by a preponderance of the evidence that the terrazzo flooring at PHL was not sufficiently slip resistant for shoeless passengers. It is common knowledge that socks provide less traction than rubber-soled footwear. Both experts agreed that socks are less slip resistant than the footwear anticipated by the flooring codes and guidelines.[23] While the Court cannot lend credibility to Mr. Moore's methodology, both he and Mr. Mills testified about the "greater probability of a slip-and-fall in socks than in footwear."[24]  The video reveals that at least one other passenger slipped in their socks traversing the terrazzo that day—that person was able to catch themselves before falling, unlike Plaintiff. TSA Agent Brown also testified that she sometimes sees passengers slip but they usually are able to recover without injury.[25] Moreover, both experts opined that unsuitable footwear is a primary cause of slip and fall accidents.[26]

---

[22] ECF No 100. As the City's Expert Mr. Mills, explained, "walking in socks is a bit of an unusual circumstance; that's not a common practice [found] elsewhere across the industry for flooring or floor care." *Id.* at 108.
[23] ECF No. 99 at 85; ECF No. 100 at 84.
[24] ECF No. 100 at 118.
[25] ECF No. 98 at 132. TSA Officers are not required to write an incident report when someone slips and catches themselves, nor do they have to report if someone slips and catches themselves. *Id.* at 133.
[26] ECF No. 99 at 96; ECF No. 100 at 90.

### D.  TSA's Failures to Maintain Safe Premises for Shoeless Passengers

The TSA is responsible for providing and assembling the stanchions and mats present in each checkpoint area.[27] The TSA has set up a series of black rubberized mats at the Terminal D/E checkpoint that run for approximately twelve feet and direct passengers through the body scanner.[28] The remaining floor at the checkpoint is made up of the same terrazzo flooring found throughout much of the airport.[29] The rubberized mats, which are purchased and set up by TSA, serve two functions: (1) anti-fatigue support for TSA agents who must stand in position for long stretches of time; and (2) directing passengers through the screening area.[30]  There are no signs posted at TSA checkpoint areas warning of the risk of slippery flooring conditions for people in socks.[31]

The TSA performs daily safety inspections of the checkpoint areas for slipping hazards like spills but has never performed an overall inspection or analysis of the terrazzo flooring at PHL to ensure it is safe to traverse in socks.[32] Anti-slip coating has never been applied to the terrazzo flooring at PHL.[33] The experts agree, and common sense leads this Court to conclude that the rubberized anti-fatigue mats provide a walking surface with better traction for shoeless pedestrians.[34]

---

[27] ECF No. 98 at 85.
[28] Government Exh. 30; ECF No. 98 at 50-12
[29] Trial Tr. Oct. 25, 2023 (ECF No. 100) at 90.
[30] ECF No. 98 at 68-69.
[31] *Id.* at 113, 120.
[32] ECF No. 98 at 50-51; ECF No. 99 at 98-99.
[33] ECF No. 98 at 52.
[34] While some evidence was presented that mats can fray, degrade, or bunch up, the general conclusion that rubberized anti-fatigue mats would aid in slip protection outweighs any hypothetical tripping hazard they pose.

### E.  *Plaintiff's Injuries and Treatment*

As a result of her slip-and-fall at the TSA checkpoint, Plaintiff sustained a tibial plateau fracture. On January 28, 2021, Dr. Steven Manifold, her treating Orthopedist, performed surgery, which required the placement of permanent plates and screws. Plaintiff has a permanent scar on her knee as a result of the surgery.[35] Following her surgery, Plaintiff attended inpatient physical therapy for several weeks.[36] She then went to outpatient physical therapy until she was discharged on May 5, 2021.[37] Dr. Manifold testified that Plaintiff was not fully compliant with the physical therapy recommended by her physicians and therapy providers, which somewhat limited her physical recovery from the knee injury.[38] Plaintiff continues to suffer from stiffness and pain in her knee and is likely to develop permanent knee arthritis in the future.[39]

## II.    CONCLUSIONS OF LAW

The Court must now determine whether Plaintiff has proven her case for negligence by a preponderance on the evidence[40] against both Defendants. The City argues it: (1) owes no duty to inspect the TSA checkpoint area for any defect; (2) had no notice of a slippery condition of the flooring for shoeless passengers; and (3) is immune from suit because it was the TSA that had control of the premises. The United States[41] argues: (1) TSA is not the possessor of land where the security checkpoint exists; (2) even if it were, Plaintiff has failed to provide evidence of a condition

---

[35] ECF No. 98 at 183.
[36] ECF No. 99 at 14-16.
[37] *Id.* at 11, 26.
[38] Dr. Manifold Videotaped Trial Test. Oct. 16, 2023; *See* Government Exhibits 17-19, 32; ECF No. 99 at 22, 24–29.
[39] ECF No. 99 at 189-190; Mr. Manifold Videotaped Trial Test. Oct. 16, 2023.
[40] The preponderance of the evidence standard requires plaintiffs to establish that what they claim is more likely so than not so. *Greenwich Collieries v. Dir., Office of Workers' Comp.*, 990 F.2d 730, 736 (3d Cir. 1993).
[41] Plaintiff has sued the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1). Under the FTCA, the federal government waives its sovereign immunity and may be liable for acts of negligence under state law to the same extent that a private individual under similar circumstances would be liable. 28 U.S.C. § 1346. At trial, the United States again argued it is immune from suit pursuant to the discretionary function exception to the FTCA. This Court's analysis of that issue has not changed since it entered judgment in Plaintiff's favor at summary judgment. *See* Court's Opinion at ECF 67.

presenting an unreasonable risk of harm to invitees; and finally (3) the flooring condition was known and obvious. The Court concludes that Plaintiff has demonstrated by a preponderance of evidence that the Government breached its duty of reasonable care owed to her but has failed to prove the same for the City. The Court makes the following conclusions of law in support thereof:

Under Pennsylvania law,[42] a claim for negligence contains four elements: "(1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage." *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 27-28 (Pa. 2006). Plaintiffs have the burden of proof on these issues by a preponderance of the evidence. *Rippee v. Grand Valley Mfg. Co.,* 762 F.2d 25, 27 (3d Cir. 1985).

The parties do not dispute that Plaintiff, an airline passenger, was a business invitee at the time of her fall and resulting injury. Under Pennsylvania law, landowners owe business invitees "the highest duty owed to any entrant upon land." *Campisi v. Acme Markets, Inc.,* 915 A.2d 117, 119 (Pa. Super. Ct. 2006); *Carrender v. Citterer*, 469 A.2d 120, 123 (Pa. 1983); Restatement (Second) of Torts §§ 328-343B (1965). "The common law imposes a duty of care on business owners to maintain safe premises for their customers." *V.C. by Costello v. Target Corp.*, 454 F. Supp. 3d 415, 424 (D.N.J. 2020) (citing *Nisivoccia v. Glass Gardens, Inc.*, 818 A.2d 314 (N.J. 2003)). A possessor of land must take "reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered. That standard of care encompasses the duty to conduct a reasonable inspection to discover latent dangerous

---

[42] Jurisdiction for this Federal Tort Claims Act case is based upon 28 U.S.C. § 1346(b). Under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.,* liability is determined in accordance with the substantive law of the place where the alleged negligent act or omission occurred. 28 U.S.C. § 1346(b)(1); *see also,* e.g., *Matsko v. United States,* 372 F.3d 556, 559 (3d Cir. 2004).

conditions." *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110, 1113 (N.J. 1993) (citing *Handleman v. Cox*, 187 A.2d 708 (N.J. 1963)). "Ordinarily an injured plaintiff asserting a breach of that duty must prove . . . that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident." *Nisivoccia*, 818 A.2d at 316 (citing *Brown v. Racquet Club of Bricktown*, 471 A.2d 25 (N.J. 1984)).

A land possessor is subject to liability for harm caused to its invitee by a condition on the land if it:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343. Thus, as is made clear by section 343A of the Restatement:

> "[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."

Restatement, *supra*, § 343A. *See Atkins v. Urban Redevelopment Auth. of Pittsburgh*, 414 A.2d 100, 104 (Pa. 1980) ("[T]he law of Pennsylvania does not impose liability if it is reasonable for the possessor to believe that the dangerous condition would be obvious to and discovered by his invitee").

To decide whether to impose a duty on a party, Pennsylvania courts apply a five-factor test, considering: (1) the relationship between the parties; (2) the utility of the defendant's conduct; (3) the nature and foreseeability of the risk in question; (4) the consequences of imposing a duty; and (5) the overall public interest in the proposed solution. *R.W. v. Manzek*, 888 A.2d 740, 746-47 (Pa. 2005) (citing *Althaus v. Cohen*, 756 A.2d 1166, 1168 (Pa. 2000)).

Although a possessor of land has a duty to protect a business invitee from foreseeable harm, that duty is not absolute. A possessor of land owes no duty to a plaintiff if the plaintiff "discover[ed] dangerous conditions which [were] both obvious and avoidable, and nevertheless proceed[ed] voluntarily to encounter them." *Carrender v. Fitterer*, 469 A.2d 120, 125 (Pa. 1983). "Under the doctrine of assumption of the risk, a defendant is relieved of its duty to protect a plaintiff where the plaintiff has voluntarily and deliberately proceeded to face a known and obvious risk and therefore is considered to have assumed liability for his own injuries." *Barrett v. Fredavid Builders, Inc.*, 685 A.2d 129, 130 (Pa. Super. Ct. 1996); *see* Restatement (Second) of Torts § 343A; *Carrender*, 469 A.2d at 125.

A danger is "obvious" when "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment." *Carrender*, 469 A.2d at 123. For a danger to be "known," it must "not only be known to exist" but also "recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated." *Id.* at 124. Therefore, the assumption of risk doctrine "must be examined when determining whether the defendant owed plaintiff a duty." *Roessing*, 2021 WL 1663590, at *6 (citing *Kaplan v. Exxon Corp.*, 126 F.3d 221, 224–25 (3d Cir. 1997)). Assumption of the risk is a question for the jury "unless reasonable minds could not disagree." *Kaplan*, 126 F.3d at 225 (citing *Carrender*, 469 A.2d at 124).

Generally, a landlord out of possession cannot be held liable for injuries incurred by third parties on the leased premises because the landlord does not owe them a duty of care. *Kobylinski v. Hipps,* 519 A.2d 488, 491 (Pa. Super. Ct. 1986); *Henze v. Texaco, Inc.,* 508 A.2d 1200, 1202 (Pa. Super. Ct. 1986) (internal citations omitted). The reason is that the law views a lease as "the equivalent of a sale of the land for the term of the lease." *Jones v. Levin*, 940 A.2d 451, 454 (Pa.

Super. Ct. 2007). Therefore, "liability is premised primarily on possession and control, and not merely [on] ownership." *Id.* (quoting *Deeter v. Dull Corp., Inc.,* 617 A.2d 336, 339 (Pa. Super. Ct. 1992)).

While there are various exceptions to the general rule of non-liability of a landlord out of possession, none apply to the City in this case. *See Jones*, 940 A.2d 451 at 453. The most applicable exception would be the "reserved control" exception, which holds that "the landlord may be liable if he or she has reserved control over a defective portion of the leased premises or over a portion of the leased premises which is necessary to the safe use of the property." *Id.* The reserved control exception cases generally involve "common areas" like shared stairwells or hallways in buildings leased to multiple tenants. *Id.*

The City also argues that Plaintiff's premises liability action against it is barred by governmental immunity. Plaintiff asks the Court to find the City liable under the real property exception to the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8542(b)(3). Section 8541 of the Pennsylvania Judicial Code provides that, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541. Section 8542 provides that governmental immunity is waived under certain circumstances.[43]

One of the exceptions under subsection 8542(b) is the real property exception:

---

[43] 42 Pa. C.S. § 8542(a) provides:
    (a) Liability imposed.--a local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
        (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
        (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

(b) Acts which may impose liability.--The following acts by a local agency or any of its employees may result in the  imposition of liability on a local agency:

    . . . .

> (3) Real property.--**The care, custody or control of real property in the possession of the local agency**, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency. . . . 42 Pa. C.S. § 8542(b) (emphasis added).

The Pennsylvania Supreme Court holds that, as an exception to the general rule of governmental immunity, the real property exception "must be narrowly interpreted given the expressed legislative intent to insulate political subdivisions from tort liability." *Mascaro v. Youth Study Ctr.*, 523 A.2d 1118, 1123 (Pa. 1987). A narrow interpretation of the term "possession" requires this Court to define it as "total control over the premises". *Jones* 451 A.2d at 455 (quoting *City of Pittsburgh v. Estate of Stahlman*, 677 A.2d 384, 387 (Pa. Commw. Ct. 1996) (emphasis added)). "[L]imited control or mere occupation of the premises for a limited period is insufficient to impose liability." *Id.*

The Court concludes that the TSA exercised control over the premises on which the accident occurred, not the City. While the City is responsible for the day-to-day operations of PHL, the screening area where the accident occurred was within the exclusive control of TSA. The evidence presented at trial clearly demonstrated that the City has extremely limited access to the TSA security screening areas at PHL. The TSA restricts the City's access to the checkpoints to the overnight period when custodial personnel perform cleaning duties.[44] The only other time City employees can enter the checkpoint area is when summoned by the TSA. The TSA mandates that the City refrain from touching any equipment or modifying the layout in any manner. The TSA maintains exclusive control over the arrangement of mats and stanchions.

---

[44] There were not sufficient facts presented at trial on the issue of whether the cleanliness of the floors contributed to the slippery condition. Therefore, this Court makes no findings as to the cleanliness of the terrazzo or whether the City's cleaning protocols were followed or adequate.

The City is required by contract and under federal law to provide space to the TSA for security screening, and the TSA independently operates and exercises control over not just the screening process, but importantly for this case, the way the screening area is assembled or organized. The City has maintained its premises in accordance with flooring safety standards, which are based on the assumption that people will be wearing shoes. The terrazzo flooring is safe for pedestrians wearing appropriate footwear throughout the rest of the airport. The City had no independent duty to "inspect and discover whether it was safe for passengers in their socks to walk on the terrazzo flooring" as Plaintiff contends. The City "provided a slip-resistant floor under expected walking conditions wearing footwear."[45]

The TSA had a duty to conduct reasonable inspections of its checkpoint areas to discover dangerous conditions and to provide such warnings or safeguards as may be necessary for the business invitee's protection. Here, the evidence shows that the TSA should have long been aware that the terrazzo flooring at PHL presented a slipping hazard for travelers navigating the security checkpoint in their socks. Despite its knowledge of the risks to passengers, TSA failed to take any remedial steps to address the hazardous condition. The TSA breached its duty to Plaintiff by failing to: (1) perform any inspection of the floors to test slip resistance for shoeless passengers; (2) provide warnings to passengers of the walking surface conditions for people wearing socks; (3) place the anti-fatigue mats all the way through the checkpoint area. The placement of additional mats in the checkpoint through the area where passengers retrieve their shoes and belongings from the x-ray conveyor belt would likely have prevented Plaintiff's fall.

The TSA exhibited negligence in failing to provide a slip-resistant pathway for airline passengers like Plaintiff who are compelled to navigate checkpoint areas without appropriate

---

[45] ECF No. 100 at 108.

footwear. Having found the Government liable for negligence, a judgment in the total amount of $250,000 is awarded to Plaintiff. Plaintiff is entitled to damages for medical costs and pain and suffering and her award is reduced based on her failure to fully comply with post-op physical therapy.